Thomson, J.
On tbe lltli day of August, 1896, Tbe Denver Life Insurance Company issued and delivered to Dr. Henry H. Bucknum its policy of insurance, whereby it insured bis life in tbe sum of $5,000 for tbe benefit of Elsie M. Bucknum, bis wife. Tbe consideration for *210 the policy as expressed in the instrument was,' among other things, the full payment of the first annual premium, $73.56, and the agreement of the insured that further payments should be made annually, semi-annually, quarterly or monthly in advance. Dr. Bucknum was one of the medical examiners for the company, it was contemplated that the fees for examinations, which he was to receive from the company, would be enough to cover the premium and the further payments. Some time afterwards it was found that the company was unable to furnish him with a sufficient number of examinations to carry the amount' of insurance named in the policy. After this fact had been ascertained, Charles E. Channell, secretary of the company, and Dr. Bucknum had several conversations on the subject, in which the doctor said that he was dependent upon the examinations to carry his policy, and was without funds to make good the de-' ficiency. The total amount earned by him as examiner was insufficient to keep the policy in force after August 11, T897; and in subsequent conversations with him he was notified by the president that his policy had lapsed. The doctor was desirous of insurance, and on the first day of September, 1897, it was agreed that the amount of the insurance should be reduced to $2,000; and, accordingly, on that date, the doctor made and subscribed the following application to the company:
“Application eor Reinstatement and Warranty oe Health to the Denver Liee Insurance Company", Denver, Colorado.
“Whereas, a premium payment upon my policy No. 7 became due and payable on the 11th day of August, 1897, and by reason of the nonpayment of said premium when due my policy expired,
“Now, therefore, I, IT. H. Bucknum, of Denver, occupation physician, do hereby apply to The Denver *211 Life Insurance Company, for reinstatement of my policy, and tender the amount of past due payment of-$15.46, which will carry the payment upon my policy to February 11, 1898. In consideration of the same being accepted and my policy restored to regular standing, I agree as follows:
“First. I warrant that I am now of temperate habits, in good health and free from all infirmities. That since the date of my original application I have had no disease, injury, infirmity or illness, nor had any medical attendance, or advice for any illness except as follows, viz.:
“Second. I hereby agree that if any of the statements and warrants above given are not full, complete and true, that the acceptance by The Denver Life Insurance Company of this or any other payment shall not make a valid claim under said policy, and the only liability against The Denver Life Insurance Company shall be the amount of this and subsequent premium payments with compound interest added at four per cent, per annum.
“Dated at Denver, this 1st day of September, 1897. “H. H. Bueknum.”
The company accepted the application and, on the same day, altered the old policy except as to its date, so as to adapt it to the new contract, and delivered it to him. The alteration was made by erasing the word “five” where the amount of the insurance was named, and inserting the word ‘£ two, ’ ’ and by erasing the figures representing the payments which were required to maintain a policy for $5,000, and inserting figures representing the payments required to support a policy for $2,000. At the foot of the policy these words were written: £ 1 This policy reduced to $2,000, from August 11,1897. C. E. Channel!, Secretary.” The doctor elected to make his payments semi-annually. The amount of each of *212 such payments was $15.46; and by tbe alteration it was so- made to appear in tbe policy. Tbe semiannual premium on tbe $5,000 policy was $38.63. Tbe doctor made bis first payment immediately. About two months afterwards it came to tbe knowledge of. tbe officers of tbe company that when tbe doctor made tbe application be was suffering from a disease known as paretic dementia. A meeting of tbe board of directors was immediately called, at which it was determined to refund tbe money paid by bim, and notify bim that bis policy was cancelled. Accordingly, on September 16, 1897, tbe secretary wrote tbe doctor a letter, enclosing a check for tbe premium paid by bim and advising bim that bis policy bad been cancelled. Tbe doctor refused to accept tbe check and returned it. It was then sent to bis wife, and she also returned it. Tbe doctor died on tbe 13th day of March, 1899, and Mrs. Bucknum brought this suit to recover tbe amount named in tbe policy.
Tbe complaint alleged tbe issuance of a policy to tbe doctor for $2,000, setting forth the instrument and its attached conditions in full; alleged tbe death of tbe insured, tbe performance of all tbe conditions of tbe policy by bim and by tbe plaintiff, and demanded judgment for $2,000. Tbe answer admitted tbe execution and delivery of tbe policy and tbe death of tbe insured, and after setting forth tbe facts in connection with tbe original insurance for $5,000, tbe failure of tbe insured to pay tbe premiums due, tbe consequent forfeiture of tbe policy, tbe application of tbe insured for a reinstatement of tbe policy, tbe payment by bim of tbe amount of tbe semi-annual premium of $15.46 on tbe policy as altered, averred that. tbe statements of tbe insured as to bis health, in bis application for that policy, were false, and were known by bim to be false at the time they were made; that be was at that time and for a long time before *213 had been, suffering from a disease known as paretic dementia, and which resulted in his death; that he was then being, and before making his application had been, treated by a physician for that disease; that these facts were unknown to the company when it allowed the reinstatement and changed the policy; but that immediately when it became advised of them it sent to- the doctor its check for the amount of the premium he had paid, notifying him that by reason of his misrepresentations his policy had been can-celled, but he refused to receive it and returned it, as did also his wife, the beneficiary, to whom it was subsequently sent.
The replication admitted the allegations concerning the disease from which the doctor was suffering, and admitted that it finally resulted in his death; but averred that at the .time he made the application his mind was so shattered that he was incapable of judgment in relation to his statements. The replication further denied knowledge or information sufficient to form a belief as to the other allegations of the answer.
Dr. Eskridge, the physician under whose care Dr. Bucknum was from December, 1896, until April or May, 1897, and who frequently met and conversed with him afterwards, testified that in April his mental symptoms, the meáning of which were at first undeterminable, clearly indicated paretic dementia, and that the disease progressed rapidly; that the effects of his disorder were hallucinations that he was perfectly well and that he was about to come into the possession of great wealth; that in May he refused to submit to treatment for the reason that, being entirely well, his condition did not require it; that his memory was very poor; and that about the first of September he could not reason intelligently on the question of his health. The witness also testified that a person afflicted' with paretic dementia has a false- *214 conception of Ms health.; and, if the mental symptoms’ are well developed, has an extravagent sense of being well. It was shown, however, that during the period covered by the testimony of Dr. Eskridge, Dr. Bucknum was practicing his profession, giving out prescriptions — the last being dated September 1, the day he made the application — and that these prescriptions all indicated sound judgment. It was also shown that in the conversations between Dr. Bucknum and the secretary of the company respecting the original policy, his inability to make the payments necessary to sustain it, and his desire for its reinstatement, his recollection of the antecedent facts was accurate, and to all appearances he had full control of his faculties. It also appeared that on the 11th day of February, 1898, the 11th day of August, 1898, and the 11th day of February, • 1899, the plaintiff tendered to the defendant $15.46 as the premium due by the terms of the policy on each of those days.
Among the conditions and stipulations annexed to the policy was the following:
“Thirty days’ notice before payment is due, except when monthly payments are made, will be mailed to the insured from the home office to the last known address as it appears upon the books of the company. Failure to make any payment at the home office on or before the day when due, whether the insured does or does not receive such notice, hereby cancels this contract and releases the company and the insured from any further liability, and all payments made on account thereof shall be forfeited to the company. ’ ’
In the course of the examination of one of the defendant’s witnesses the fact was elicited that while Dr. Bucknum was the holder of the original policy for $5,000, no notice that payments would become due was ever mailed to him. The court rendered judg *215 ment for the plaintiff for the amount payable by the terms of the new policy, on the sole ground that the notice provided for in the stipulation we have quoted was not given; holding that by reason of the failure to give the notice, the original policy never lapsed. The defendant appealed.
This suit was not brought upon the original policy. The complaint set forth the policy for $2,000, which required the payment of a semi-annual premium of $15.46. By tendering the premium for the payment of which that policy provided, and by bringing her suit upon that policy, averring the performance by the insured and by her of all the conditions of the contract evidenced by that policy, the plaintiff, at least so far as this suit is concerned, adopted the act of her husband in procuring it. "Whether the original policy had lapsed is, under the pleadings, not a question for judicial determination. In deciding that the first policy was still in force the court went outside of the case made by the pleadings. These presented but one issue, and that related to the nature of the representations made by the insured respecting his health in his application for reinstatement.' The language is that of a warranty, but the defendant has chosen to regard it merely as conveying representations, and we shall allow it no different effect. Those representations are alleged to have been not only untrue, but untrue to the knowledge of the insured when made. The charge was that they were wilfully and intentionally false. The question therefore was whether the insured knowingly misrepresented his condition. There was evidence to warrant the conclusion that, owing to a state of mind for which he-was not responsible, he thoroughly believed' himself to be in perfect health, and the fact that he had been under the care of a physician had vanished from his memory. If such was the case, his state *216 ments were not intentionally false. On the other hand there was evidence to justify an inference that his capacity for recollection of past events had not been impaired, and that, therefore, the fact that he had been the subject of medical attendance could not have been forgotten. Upon the question whether the insured knew his statements to be false when he made them the court ventured no finding. That question was the only one presented by the pleadings, and without its determination no judgment could be properly rendered in the suit. The necessary finding cannot be made here, and the judgment is reversed and remanded for trial and decision of that issue. Upon the question what the effect of proof of the applicant’s insanity when he made the application would be so far as concerns the original policy, we express no opinion, because it is not presented by this record.

Reversed.